| Offense | Martin's Sentence | To Be Served | Statutory Maximum |
|---------|-------------------|--------------|-------------------|
| $18 U.S.C. § 1341 Mail Fraud | 60 months | 52 concurrent with the wire fraud, 8 months consecutive to the wire fraud | Five years (60 months) |
| 18 U.S.C. § 1343 Wire Fraud | 60 months | 52 concurrent with the mail fraud, 8 months consecutive to the mail fraud | Five years (60 months) |
| 18 U.S.C. § 2314 Interstate Transportation of Stolen Property | 120 months | Consecutive to the mail and wire fraud, but concurrent with the money laundering | Ten years (120 months) |
| 18 U.S.C. § 1957 Money Transactions in Criminally Derived Property | 120 months | Consecutive to the mail and wire fraud, but concurrent with the interstate transportation of stolen property | Ten years (120 months) |

James F. ROBINSON, Plaintiff–Appellant,

v.

SOLANO COUNTY; Brian Cauwells, Solano County Sheriff's Deputy officer; Gary Faulkner, Solano County Sheriff's Deputy Officer, Defendants–Appellees.

No. 99–15225.

United States Court of Appeals, Ninth Circuit.

Panel Decision Filed July 12, 2000.

En Banc Argument March 22, 2001.

Submission Deferred April 23, 2001.
Resubmitted Sept. 26, 2001.
Filed Feb. 4, 2002.

William M. Simpich, Oakland, CA, for the plaintiff-appellant.

Terence J. Cassidy, Porter, Scott, Weibert & Delehant, Sacramento, CA, for the defendants-appellees.

Before: SCHROEDER, Chief Judge, and HUG, B. FLETCHER, CANBY, REINHARDT, FERNANDEZ, RYMER, T.G. NELSON, KLEINFELD, GOULD, and PAEZ, Circuit Judges.

Opinion by Chief Judge SCHROEDER; Concurrence by Judge FERNANDEZ.

SCHROEDER, Chief Judge.

We took this case en banc in order to clarify the law of the circuit regarding excessive force that violates the Fourth Amendment's protections against unreasonable searches and seizures, and to clarify the law of the circuit on the scope of qualified immunity for excessive force claims. The case arises out of a police seizure at gunpoint of an apparently unarmed individual suspected of having earlier used a shotgun to shoot two dogs.

The Fourth Amendment guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. In *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the U.S. Supreme Court held that all claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other seizure of an individual should be analyzed under the Fourth Amendment's "objective reasonableness" standard. The Court also cautioned, however, that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

Here we must address the interplay between the Fourth Amendment's objective reasonableness standard for claims of excessive force and the standard for measuring the scope of a law enforcement officer's qualified immunity, which also embodies a reasonableness standard. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The U.S. Supreme Court recently grappled with this subject in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), and we follow its teachings.

**FACTS**

The Plaintiff-Appellant is James F. Robinson, an African–American retired

San Francisco police officer. Defendants–Appellees are the County of Solano and individual police officers Brian Cauwells and Gary Faulkner.

When the events at issue in this case took place, Robinson was 64 years old. He lived in a farmhouse set on a five-acre parcel in a semi-rural area of Fairfield, California, where he raised livestock including cattle, ducks, turkeys, geese, and chickens. He had fenced his property and kept a shotgun to protect his livestock. One morning he saw two dogs attacking and killing his livestock. He took out his shotgun and shot both dogs, killing one and wounding the other. Robinson then went looking for the wounded dog. His search took him to the public road fronting his property, and he walked approximately 50 feet along the road carrying the shotgun.

Robinson's neighbor Sarah Reyes, the owner of the dogs, came out of her house while Robinson was on the road looking for the wounded dog. According to Robinson, he was standing approximately 160 feet from Ms. Reyes when she yelled to him about the dogs. She was angry that he had shot her dogs, and he tried to explain that he did not know the dogs were hers. After the two had a heated conversation, Robinson returned home.

Ms. Reyes went back into her house and phoned the police. The police sent out a radio dispatch regarding a man carrying a shotgun who had just shot two dogs and "is in the middle of the street yelling at this time." The appellee officers were among the police officers who responded to the call and parked on the public road in front of Robinson's property.

Robinson, who was apparently at that moment inside discussing with his wife whether to call the authorities, saw six police vehicles pull up outside his home. He decided to go out and explain the incident to them. Wearing an unbuttoned shirt and a pair of jeans, he walked the 135 feet from his front door to the street. He asserts that the officers were able to see him approach, and that they observed that his demeanor was calm. He also states that the officers kept their guns holstered as he approached. Officers Cauwells and Faulkner, however, contend that Robinson appeared agitated, and that they unholstered their guns upon first seeing him.

As Robinson neared the street, Officer Cauwells, who had then been with the police force approximately nine months, walked forward to meet him. Robinson said, "My name is Robinson and I'm the man that was involved with the dogs." Officer Cauwells then pointed his gun at Robinson's head from a distance of about six feet. Officer Faulkner also took out his gun and pointed it at Robinson. Cauwells told Robinson to put his hands over his head. As Robinson was putting his hands up, he asked the officers "What's going on?" Without answering the question, Cauwells repeated the command as he stepped forward, and according to Robinson, thrust his gun three or four feet from Robinson's head. As a former police officer, Robinson was aware of the immediate physical danger posed by a gun pointed at his head from point blank range; he testified that he feared for his life.

Two police officers not named in this suit handcuffed Robinson and shoved him into the back seat of their patrol car. Robinson was confined in the police car while the officers talked to Ms. Reyes and other neighbors. The interval was approximately 15–30 minutes. Both sides agree that Robinson attempted to explain the situation to the officers, but that they refused to listen to him. The officers released Robinson after they ascertained that he had not violated the law.

Robinson asserts that at no time—from the original detention to release—did the officers search him for any weapons. He was in fact wearing a four-inch utility knife strapped to his belt that was never detected. Robinson was not charged with any crime for the events in question.

## PROCEDURAL BACKGROUND

Robinson filed a civil action in federal court alleging both state and federal claims against the individual officers and Solano County. The district judge granted partial summary judgment with respect to all claims against Solano County and all state law claims against the individual defendants. However, the district judge declined to grant summary judgment on the § 1983 excessive force claim against the police officers. The parties then stipulated to a jury trial on the federal claim before a magistrate judge.

The jury found that the length of Robinson's detention was reasonable, but divided four to four on the question of whether the force employed to seize Robinson was reasonable. The trial court dismissed the jury after the deadlock. The court then granted the appellees' Rule 50 motion for judgment as a matter of law on the federal excessive force claim, holding that the officers were entitled to qualified immunity.

Robinson appealed the grant of summary judgment on the state law claims and the grant of judgment as a matter of law on the federal excessive force claim. The original three-judge panel of this court reversed. It held that the officers were not entitled to qualified immunity on the federal excessive force claim because: (1) the contours of the law governing pointing of guns were sufficiently clear to put a reasonable officer on notice that pointing a gun at Robinson's head, under the circumstances alleged, would violate his constitutional rights; and (2) disputed issues of material fact existed regarding the force actually used by the officers and whether such force was reasonable under the circumstances. *See Robinson v. Solano County*, 218 F.3d 1030 (9th Cir.), *reh'g en banc granted*, 229 F.3d 931 (9th Cir.2000). In so deciding, the panel relied on our circuit law then recently explained in *Katz v. United States*, 194 F.3d 962 (9th Cir. 1999), *rev'd*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Judge O'Scannlain dissented. The panel also reversed the court's grant of summary judgment on the state-law torts.

After we ordered this case to be reheard en banc, the U.S. Supreme Court granted certiorari in *Katz. Saucier v. Katz,* 531 U.S. 991, 121 S.Ct. 480, 148 L.Ed.2d 454 (2000). We heard oral argument, but deferred submission pending the Supreme Court's decision in *Katz.* We called for supplemental briefs and took the case under submission following the Supreme Court's decision in *Katz. See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### The *Katz* Case

Our circuit law, prior to the Supreme Court's decision in *Katz,* focused on qualified immunity principles enunciated by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Harlow* instructed us to determine whether the law governing the official's conduct was clearly established, and if so, whether a reasonable official could have believed the conduct was lawful. *See Somers v. Thurman,* 109 F.3d 614, 616–17 (9th Cir.1997). The Ninth Circuit in *Katz* endeavored to follow those principles in the context of an excessive force case. *See Katz,* 194 F.3d at 967–71. The panel in *Katz* observed that the inquiry on the merits as to whether the use of force was reasonable, and the inquiry on immunity

as to whether a reasonable officer could have believed that the force used was reasonable under the circumstances, both focused on the objective reasonableness of the officer's conduct. We therefore stated that " 'the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim.' " *Id.* at 968 (quoting *Alexander v. County of Los Angeles,* 64 F.3d 1315, 1322 (9th Cir.1995)). We held that a material issue of fact on the reasonableness of the officer's conduct necessitated a trial. *Id.* at 970.

The Supreme Court granted certiorari and determined that our analysis was at odds with the fundamental principle that issues of qualified immunity should be determined at the earliest possible stage. *See Katz,* 121 S.Ct. at 2155–56. The Court also determined that the Ninth Circuit's analysis did not allow for the fact that an officer might make a reasonable mistake as to whether or not conduct violated the Fourth Amendment.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* at 2158.

▮ The Court therefore held that the standard of reasonableness for purposes of qualified immunity is distinct from the standard of reasonableness embodied in the Fourth Amendment. *Id.* at 2158–59. The Supreme Court thus overruled our cases that had treated the standard as the same, including the panel opinion in this case, 218 F.3d at 1036, as well as the panel opinion in *Katz,* 194 F.3d at 967–68. *See Katz,* 121 S.Ct. at 2157. *See also Headwaters Forest Defense v. County of Humboldt,* 240 F.3d 1185, 1207 (9th Cir.), *vacated by* — U.S. ——, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001) (remanding for reconsideration in light of *Katz* ).

The Supreme Court in *Katz* was also concerned that, by jumping too quickly to the immunity question of whether a reasonable officer could have believed that his conduct violated the Fourth Amendment, the courts might inhibit the development of Fourth Amendment law. It therefore instructed courts to examine in every case, as the first inquiry in determining immunity, whether the plaintiff alleged a constitutional violation:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question of whether the law clearly established that the offi-

cer's conduct was unlawful in the circumstances of the case.

*Katz*, 121 S.Ct. at 2156.

Consequently, after *Katz*, in an excessive force case like this one, we must ask first whether the facts taken in the light most favorable to the plaintiff would establish a violation of the Fourth Amendment. Only if the answer is in the affirmative should we address the immunity issue. The immunity inquiry then focuses on whether the law was clearly established at the time. *Id.*

We conclude in this case that the plaintiff has alleged a violation of the Fourth Amendment, but that in light of *Fuller v. Vines*, 36 F.3d 65 (9th Cir.1994), the law in this circuit was unclear concerning when an officer may reasonably point a gun at a suspect during an investigation. There were also conflicting decisions in other circuits at the time of the challenged conduct. The officers are therefore entitled to qualified immunity. Because the officers' immunity under state law is narrower, we reverse and remand the state law claims against the individual officers.

### The Alleged Violation of the Fourth Amendment

Although the officers never formally arrested Robinson, they did detain him at gunpoint, handcuff him and place him in the squad car while they talked to other witnesses. The fact of a seizure is not disputed, nor is any issue raised concerning the amount of force involved in handcuffing Robinson and placing him in the squad car. That conduct did not in and of itself constitute excessive force. The only dispute is whether the officers' use of a drawn gun pointed at Robinson's head from close range constituted excessive force.

The leading case in our circuit involving a drawn gun is *Fuller v. Vines*, 36 F.3d 65

(9th Cir.1994). There, however, the issue was not whether there was excessive force, but whether there was a seizure. In *Fuller* we held there was no seizure because the police were some distance from the plaintiff, *id.* at 67, and there was no allegation that the use of the gun restricted the plaintiff's liberty. *Id.* at 68. Here the plaintiff was handcuffed and sequestered. In *Fuller*, in contrast, there was "no contention that he was arrested or that his liberty was restrained," and the officers claimed they were acting in self-defense. *Id.*

In *Fuller* we applied the *Mendenhall* test, as we do here, which requires that for there to be a seizure there must be "a restraint of liberty such that the person reasonably believes he is not free to leave." *Fuller*, 36 F.3d at 68 (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). We concluded in *Fuller* that there was no seizure because the gun was used only to ensure that the plaintiff could not attack the officers. In this case, by contrast, Robinson has alleged a seizure because, with a gun pointed at his head and then handcuffed, he reasonably believed he was not free to leave. To the extent that *Fuller* may be read as suggesting that the conduct of officers in pointing a gun at a suspect during an actual seizure can never be excessive force, it is overruled.

Having concluded that there was a seizure in this case, we turn to the question of whether the seizure was unreasonable because the officers used excessive force, *i.e.*, force that was not "objectively reasonable" in light of the facts and circumstances confronting the officer. *See Graham*, 490 U.S. at 397, 109 S.Ct. 1865. As the Supreme Court cautioned in *Graham*, this determination "requires careful attention to the facts and circumstances of

each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

In this case, it is not alleged that any of the factors justifying the use of force were present. The crime under investigation was at most a misdemeanor; the suspect was apparently unarmed and approaching the officers in a peaceful way. There were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff.

Our discussion in *Chew v. Gates,* 27 F.3d 1432 (9th Cir.1994) is helpful. We there stated that courts may in appropriate cases consider many relevant factors, including "whether a warrant was used, whether the plaintiff resisted or was armed, whether more than one arrestee or officer was involved, whether the plaintiff was sober, whether other dangerous or exigent circumstances existed at the time of the arrest, and the nature of the arrest charges." *Id.* at 1440 n. 5 (citing *Hunter v. District of Columbia,* 943 F.2d 69, 77 (D.C.Cir.1991)). Consideration of those factors does not support the use of force in this case. Indeed, in this case, Robinson was never formally arrested or charged with any crime.

The only circumstances in this case favoring the use of force was the fact that plaintiff had earlier been armed with a shotgun that he used to shoot the neighbor's dogs. We conclude that Robinson's earlier use of a weapon, that he clearly no longer carried, is insufficient to justify the intrusion on Robinson's personal security. He therefore has alleged a claim of excessive force in violation of the Fourth Amendment under the standard of "objective reasonableness" enunciated by the Supreme Court in *Graham.*

Indeed, under more extreme circumstances the pointing of a gun has been held to violate even the more rigorous standard applicable before *Graham,* when plaintiffs were required to establish conduct so excessive that it "shocked the conscience." In *McKenzie v. Lamb,* 738 F.2d 1005, 1010 (9th Cir.1984), we held that a raid not supported by probable cause involved excessive conduct that shocked the conscience where, among other things, police officers "pressed the barrels of their guns against appellants' heads." In so holding, we relied upon *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981). In *Black* the Third Circuit affirmed a jury verdict against an officer for excessive force under the "shocks the conscience" standard where the officer, in the course of arresting a plaintiff, pointed a gun at his head with his wife directly in the line of fire. *Id.* at 188–89. *See also McDonald v. Haskins,* 966 F.2d 292 (7th Cir.1992) (pointing gun at the head of a nine-year-old boy and threatening to shoot during a search of the boy's parents' apartment is excessive force).

We agree with the observations of the Third Circuit in *Baker v. Monroe Township,* 50 F.3d 1186 (3d Cir.1995), in reversing the district court's grant of summary judgment in favor of the defendant officers. The Third Circuit held that officers who, in the course of a drug raid, pointed guns at people not under suspicion, handcuffed them and detained them for 25 minutes could be liable for a Fourth Amendment violation:

> There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest.... But use of guns and handcuffs must be justified by the circumstances.... Moreover, we must look at the intrusiveness of all aspects of the incident in the aggregate.

In this case, adding up the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the Bakers' personal security.

*Id.* at 1193 (citing, *inter alia, United States v. Del Vizo,* 918 F.2d 821 (9th Cir. 1990)).

In cases involving investigatory or *Terry* stops, we have consistently applied the principle that drawing weapons and using handcuffs or other restraints is unreasonable in many situations. *See, e.g., Del Vizo,* 918 F.2d at 825; *Washington v. Lambert,* 98 F.3d 1181, 1187 (9th Cir.1996) ("Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment."). We agree with the Fifth Circuit that "[a] police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him." *Petta v. Rivera,* 143 F.3d 895, 905 (5th Cir.1998) (citation omitted) (emphasis in original).

Robinson has adequately alleged a violation of his Fourth Amendment rights.

### Whether the Law Was Clearly Established

To determine whether the officers are entitled to immunity from a further trial to determine liability, we must, after *Katz,* additionally address whether it would have been clear to the officers in 1995 that their alleged conduct was unlawful. *See Katz,* 121 S.Ct. at 2156. "If the law did not put the officer[s] on notice that [their] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 2156–57 (citing *Malley*

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ The conduct occurred in 1995, and the law at that time must be our guide. *Id.* at 2159. As the foregoing discussion reflects, up until 1989 the standard that a plaintiff had to meet in order to succeed on an unreasonable force claim was very high. The officer's conduct had to "shock the conscience." After the Supreme Court lowered the standard to "objective reasonableness" in *Graham,* the lower federal courts struggled to apply it, particularly in connection with officers' use of guns.

The development of the law with respect to arrests and detentions now allows us to recognize as a general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger. *See Del Vizo,* 918 F.2d at 825. The contours of that right were not at all clear in 1995, however. Our own *Fuller* case had cast substantial doubt on the question in the law of this circuit, and the law in the other circuits was also unclear. Some circuits had distinguished between a show of force and an actual use of force, holding that training guns on an arrestee, without shooting, could not be excessive force. The Fifth Circuit in *Hinojosa v. City of Terrell,* 834 F.2d 1223, 1229–32 (5th Cir.1988), made such a distinction. The Fifth Circuit subsequently repudiated *Hinojosa, see Petta v. Rivera,* 143 F.3d 895, 903–09 (5th Cir. 1998), but it did so years after the incident involved in the present case. In the meantime, several other circuits adopted the *Hinojosa* distinction. *See, e.g., Collins v. Nagle,* 892 F.2d 489, 497 (6th Cir.1989); *Wilkins v. May,* 872 F.2d 190, 194 (7th Cir.1989); *Edwards v. Giles,* 51 F.3d 155, 157 (8th Cir.1995).

We therefore conclude that while the facts, taken in a light most favorable to the plaintiff, would establish a violation of the Fourth Amendment, the law was not sufficiently established in this circuit in 1995 to override the officers' claim of qualified immunity. Nor was it established in other circuits. We therefore affirm the district court's dismissal of the Fourth Amendment claim on qualified immunity grounds.

## State Law Claims

■ Robinson has alleged state law claims against both the individuals and the county for false arrest, false imprisonment, assault and battery, negligence and gross negligence. The district court granted summary judgment on all of them because it held that California grants immunity to both the individual defendants and to the county. We disagree, as did the three-judge panel. *See Robinson*, 218 F.3d at 1037–38.

■ As to the county, the district court applied the rule set out in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell*, the county itself may be held liable for a violation of federal law under section 1983 only if the county has adopted an illegal or unconstitutional policy or custom. *Id.* at 690–91, 98 S.Ct. 2018. It cannot be liable for employees' unconstitutional conduct on a theory of respondeat superior. *Id.* at 691, 98 S.Ct. 2018. California, however, has rejected the *Monell* rule and imposes liability on counties under the doctrine of respondeat superior for acts of county employees; it grants immunity to counties only where the public employee would also be immune. *See* Cal. Gov't Code § 815.2; *see also Scott v. County of Los Angeles*, 27 Cal.App.4th 125, 139–40, 32 Cal.Rptr.2d 643 (1994) ("Under Government Code section 815.2, subdivision (a), the County is liable for acts and omissions of its employees under the doctrine of respondeat superior to the same extent as a private employer. Under subdivision (b), the County is immune from liability if, and only if, [the employee] is immune.") (emphasis omitted); *White v. County of Orange*, 166 Cal.App.3d 566, 570, 212 Cal. Rptr. 493 (1985) ("in governmental tort cases, the rule is liability, immunity is the exception") (citation and internal quotation marks omitted).

■ Under California law, the county's immunity depends upon whether the police officers are immune. Most of the state law claims arise from the allegation that the individual officers used excessive force, and California denies immunity to police officers who use excessive force in arresting a suspect. *See Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 215, 285 Cal.Rptr. 99, 814 P.2d 1341 (1991) ("[A] governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct."); *Scruggs v. Haynes*, 252 Cal.App.2d 256, 264, 60 Cal.Rptr. 355 (1967) ("California cases have consistently held that a peace officer making an arrest is liable to the person arrested for using unreasonable force."). Public employees are similarly not entitled to immunity in suits for false arrest or false imprisonment. *See* Cal. Gov't Code § 820.4. Accordingly, the officers are not immune from suit under California law, and neither is Solano County.

We therefore reverse the district court's grant of summary judgment on the state law claims against both the individual officers and Solano County.

## Conclusion

We hold that Officers Cauwells and Faulkner were entitled to qualified immunity on the federal excessive force claim because the Fourth Amendment law gov-

erning their conduct was not clearly established at the time of the incident. The district court's grant of judgment as a matter of law on that claim is therefore AFFIRMED. However, the district court improperly granted summary judgment on Robinson's state-law tort claims, and the judgment on those claims must be REVERSED and the claims REMANDED. Each party is to bear its own costs.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

FERNANDEZ, Circuit Judge, with whom RYMER and T.G. NELSON, Circuit Judges, join, concurring:

I concur in the result only. Although I agree that the officers are entitled to qualified immunity, I do so because, in my view, there was no use of excessive force.

My reason is quite simple. I do not believe that an officer who points a gun while making an otherwise proper seizure of a suspect can be found to have violated the Fourth Amendment by using excessive force upon the suspect, when no force whatsoever has been applied. While Robinson would like to lure us into a realm where we must dissect and second-guess each and every instance of an officer's pointing of a weapon at another person (or perhaps when he even threatens to do so), I believe it is a grave mistake to enter that

realm. It will vastly expand, even trivialize, the concerns about the use of force to accomplish a seizure which drove the Supreme Court in *Tennessee v. Garner*, 471 U.S. 1, 9–12, 105 S.Ct. 1694, 1700–01, 85 L.Ed.2d 1 (1985).[1]

The difference between a threat of force and the actual use of force upon a person can seem slight at times, but it is rarely, if ever, difficult to distinguish between the two. It is simply the ancient distinction between assault and battery. The latter requires a touching, no matter how slight; the former merely requires a threat. We can consult Blackstone[2] or Prosser[3] on that ineluctable proposition. But we need not go quite that deeply into the literature. Black's will do as well. Assault is "[a]ny willful attempt or threat to inflict injury upon the person of another, when coupled with an apparent present ability so to do...." Black's Law Dictionary 105 (5th ed.1979). Battery is "the unlawful application of force to the person of another...." *Id.* at 139.

We should adhere to that hoary distinction in this area and refuse to find excessive use of force upon another when there *has* been gun pointing, but there has not been a touching.[4] In my view, when the seizure itself is otherwise proper the mere threat of force cannot be an excessive use of force within the meaning of the Fourth Amendment.[5] Of course, if the seizure

1. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), does not deviate from those same serious concerns. In that case, actual unnecessary force was perpetrated upon the person being arrested. *See id.* at 389–90, 109 S.Ct. at 1868.

2. Assault "is an attempt or offer to beat another, without touching him." 3 William Blackstone, Commentaries *120. Battery "is the unlawful beating of another. The least touching of another's person willfully, or in anger, is a battery." *Id.*

3. Assault is putting one in apprehension of a harmful or offensive touching. William L.

Prosser, The Law of Torts 34 (2d ed.1955). Battery is unprivileged contact with the person of another. *Id.* at 30.

4. I recognize that Robinson was ultimately touched in this case, but that is not the excessive force claim that we are asked to consider. The claim here is that the mere pointing of the gun was enough to constitute excessive force.

5. The same result might well be reached if the seizure was not otherwise proper, but we need not decide that issue in this case.

itself was otherwise improper, and Robinson does not assert that this one was, that would violate the Fourth Amendment, even if no force was used. On the other hand, if the seizure itself was otherwise proper, but excessive force was applied to a person in order to effect it, and Robinson does not claim that excessive force was applied to him, that, too, would violate the Fourth Amendment. It is also true that the threat of force may ultimately lead to a seizure. But, then, perhaps it will not. *See Fuller v. Vines,* 36 F.3d 65, 68 (9th Cir.1994). The threat may also escalate and finally lead to an excessive application of force to the person of another. Still, the threat alone is not that application. One can bare a fang without biting. As I see it, showing the fang is not an excessive use of force. By and large, the case law is not to the contrary.

In one case where we narrated the story of the overall excessive force used by officers, that involved bursting into a hotel room, handcuffing the appellants, throwing them on the floor, and actually pressing guns against their heads. *See McKenzie v. Lamb,* 738 F.2d 1005, 1010–11 (9th Cir. 1984). We did not say that a mere threat of force accomplished by pointing a gun would have been excessive. Indeed, the use of the guns was simply part of a whole course of unnecessary and improper conduct. In another case, police had just slain the appellant's dog. They then pointed a gun at the appellant's head and threatened to send him " 'to the morgue.' " *Fuller,* 36 F.3d at 68. Appellant wished to amend his complaint to allege that the officers' actions as to him " 'were not objectively reasonable and constituted the use of excessive force in violation of the Fourth Amendment to the United States Constitution.' " *Id.* We held that there was no seizure because the only restraint was that the person was not free to attack the officers. *Id.* Of course, we did not separate excessive force from the concept of a seizure, but it is clear that excessive force was claimed. Again, mere pointing and threatening did not raise a constitutional issue, as we saw it.[6]

In general, other circuits have reached similar results. Thus, in *Sharrar v. Felsing,* 128 F.3d 810 (3d Cir.1997), the court determined that the use of guns, the use of vulgar language, and the requirement that the appellants lie face down on the ground was not the use of excessive force, although the court recognized that there could be excessive force without "extensive physical contact."[7] *Id.* at 821. In *Taft v. Vines,* 83 F.3d 681 (4th Cir.1996) (per curiam) (en banc), the court strongly indicated, but did not decide, that training weapons on individuals at close range, but not touching them with the weapons, was not excessive force; the court actually determined that there was qualified immunity in any event. *Id.* at 684, *adopting Taft v. Vines,* 70 F.3d 304, 317–21 (4th Cir.1995) (Motz, J., concurring in part and dissenting in part).

Similarly, in *Collins v. Nagle,* 892 F.2d 489 (6th Cir.1989), the court rejected a claim that an officer violated an individual's Fourth Amendment rights when he pointed a gun at the individual. *Id.* at 497. As the court noted, there is a vast difference between a "show of force" and "the actual use of force." *Id.* It expressed concern about second-guessing an officer's decision to draw a gun, and opined that resorting to second-guessing may well lead

---

**6.** *Cf. Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987) (per curiam) (a mere threat to do an act prohibited by the Constitution was not a constitutional wrong).

**7.** The court distinguished an earlier case where it had found a Fourteenth Amendment substantive due process violation. *Id.* at 821–22.

to even greater dangers to citizens. *Id.* In so doing, the court relied on a Fifth Circuit case, which also turned aside a claim that a constitutional right was violated when an officer pointed a gun at a citizen. *See Hinojosa v. City of Terrell,* 834 F.2d 1223, 1230 (5th Cir.1988). There, too, the appellant was not touched; he was only intimidated. *Id.* It should be noted, however, that the court was not considering a Fourth Amendment claim; it was, instead, considering a Fourteenth Amendment due process claim. *Id.* at 1228–29.[8]

And in *Edwards v. Giles,* 51 F.3d 155 (8th Cir.1995), the court turned aside a claim that the mere pointing of a gun at a suspect constituted excessive force. *Id.* at 157. Finally, in *Jackson v. Sauls,* 206 F.3d 1156 (11th Cir.2000), the court found no excessive use of force when the officer drew his gun and required the appellant to lie on the ground during an investigatory stop. *Id.* at 1171–72.

The Seventh Circuit, on the other hand, has opined that holding a gun to the head of an unoffending person—a nine-year-old child—and threatening to pull the trigger was unreasonable, where the child was not a suspect and not violent; that constituted an excessive use of force. *See McDonald v. Haskins,* 966 F.2d 292, 295 (7th Cir. 1992). It seems, but is not clear, that there was a touching, and the seizure of the child would appear to have been illegal. In any event, if the case stands for the proposition that the mere pointing of a weapon is, or can be, excessive force under

the Fourth Amendment when a seizure is otherwise proper, I disagree.[9] That same court has, however, indicated "that the action of a police officer in pointing a gun at a person is not, in and of itself, actionable." *Wilkins v. May,* 872 F.2d 190, 194 (7th Cir.1989). Earlier on, the court had determined that when officers made an "unnecessary display of force,"[10] but caused no physical or bodily injury, the substantive due process demands of the Fourteenth Amendment were not violated. *See Gumz,* 772 F.2d at 1401.

Taken together, the cases do demonstrate that the courts' explication of the law to date may not be a thing of symmetrical beauty. The courts have continued to hold out the possibility that an egregious course of conduct by police officers, which included the pointing of and threat to use a gun, might constitute use of excessive force, even without any touching. Nevertheless, the step that Robinson successfully urges upon us is a giant one. He asks us to hold that an otherwise legal seizure (detention) becomes a violation of the Fourth Amendment merely because guns were unnecessarily pointed at a suspect. At first blush, that may seem like a tiny pebble dropped into the lake of Fourth Amendment jurisprudence. It is not; what appear to be mere ripples might well become enormous waves of portentous problems. Henceforth, no officer in the Ninth Circuit can draw his gun in order to assure control of a suspect without making

---

8. In a later case, where it did find a violation arising out of a whole series of improper acts, including firing a gun at a car, the court also used a substantive due process analysis, rather than a Fourth Amendment analysis. *See Petta v. Rivera,* 143 F.3d 895, 902 (5th Cir. 1998).

9. *Holland v. Harrington,* 268 F.3d 1179, 1183–84, 1192–93 (10th Cir.2001), also involved the pointing of guns at a number of

individuals, including children. It reached a similar result as to the children, and my response is similar.

10. Ten officers armed with pistols, a rifle and a shotgun converged on the appellant to arrest him. *Gumz v. Morrissette,* 772 F.2d 1395, 1398 (7th Cir.1985), *overruled on other grounds by Lester v. City of Chicago,* 830 F.2d 706 (7th Cir.1987).

a nice calculation about whether that mere threat to use force might violate the suspect's constitutional rights. Perhaps he cannot even put his hand on his gun. Hereafter, the officer is supposed to wait until he is sure that the suspect is dangerous; he cannot attempt to "abort a potentially violent situation." *Hinojosa*, 834 F.2d at 1231. Rather, he must "wait until the situation escalates further before drawing his gun." *Id.* That is even true where, as here, violence (the shooting of dogs with a shotgun, and patrolling the neighborhood with that same shotgun to find a wounded one) has preceded the officers' encounter with the suspect. It is true even though it is admitted that the seizure itself was otherwise legal. Henceforth, we are committed to ignoring the basic difference between the mere display of force and the use of force itself. I fear that we will vastly increase the opportunities for litigation against society's front line, and heighten the legal noise level which distracts good officers, who wish to protect the rights of everyone in our society.

Like my colleagues, I do not relish the idea of police officers unnecessarily pointing guns—personally, I find that to be unnerving. Nevertheless, I do not see it as the use of excessive force because I do not read the serious commands of our Constitution as enacting an all-purpose code of civility. When we give officers their dangerous jobs, we can expect restraint; we cannot expect sangfroid.

Thus, I respectfully concur in the result only.[11]

---

**11.** I do not disagree with the majority on the state tort issue because I read the opinion as doing no more than rejecting the notion that the County and the officers are automatically immune under state law.