NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-1631

_____

STEVEN M. STIEGEL,
　　　　　　　　Appellant

v.

PETERS TOWNSHIP; OFFICER MATTHEW RUSSELL COLLINS

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2:12-cv-00377)
District Judge:  Honorable Terrence F. McVerry

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 9, 2014

Before:　VANASKIE, COWEN and VAN ANTWERPEN, *Circuit Judges*.

(Opinion Filed:  December 9, 2014)

_____

OPINION OF THE COURT[*]

_____

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

VAN ANTWERPEN, *Circuit Judge*.

Appellant Steven M. Stiegel appeals from the final decision of the District Court for the Western District of Pennsylvania, dated February 24, 2014, granting summary judgment against him and in favor of Peters Township and Officer Matthew Russell Collins. *Stiegel v. Peters Twp.*, No. 2:12–cv–377, 2014 WL 695571, at *11 (W.D. Pa. Feb. 24, 2014). For the reasons that follow, we will affirm the decision of the District Court.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This appeal arises out of events that occurred on the night of January 30, 2012. *Stiegel*, 2014 WL 695571, at *1. That night, Steven M. Stiegel ("Stiegel" or "Appellant") was hunting with his friend Nolan Majcher ("Majcher") on private property located in North Strabane Township, Pennsylvania. *Id.* Stiegel and Majcher are both licensed to hunt and possess firearms. *Id.* Around 11:00 pm, the men's hunting was interrupted by Officer Matthew Russell Collins ("Collins"). *Id.* Collins has been an officer with the Peters Township Police Department since 1995. *Id.* Peters Township neighbors North Strabane Township. *Id.*

Collins was working as the shift supervisor for the Peters Township Police Department that evening. *Id.* While Collins was traveling to the scene of a reported domestic disturbance, he noticed a single vehicle parked near a pull-off on North Spring Valley Road. *Id.* The presence of the vehicle seemed both "unusual" and "suspicious" to Collins, as the vehicle was parked (1) several hundred yards from any residences, (2) at nighttime in a rural, unlit area, and (3) in an area where Collins himself had encountered

2

criminal activity in the past. *Id.* at *1, n.1. Further, the owner of the land where the car was parked had previously complained to Collins about trespassing and other illegal activity occurring on his property. *Id.* He had asked Collins to "keep an eye out" for trespassers and other criminal activity. *Id.* Because of his suspicions, Collins decided to approach the vehicle to assess the situation. *Id.* at *1.

As Collins approached the stopped vehicle in his squad car, he saw Majcher sitting on the hillside, wearing camouflage, with a shotgun in his lap. *Id.* at *2. Majcher's shotgun was pointed in Collins's general direction. *Id.* Collins stated that he was concerned that Majcher was either preparing for a home invasion or to commit suicide. (Collins Dep., at 16). Collins then pulled his squad car next to the stopped vehicle. *Stiegel*, 2014 WL 695571, at *2. He did not activate the squad car's emergency lights or announce himself as an officer. *Id.* Even without the emergency lights or announcement, Majcher surmised that Collins was affiliated with law enforcement. *Id.*

As he approached Majcher, Collins instructed him to place his weapon on the ground. Rather than complying with Collins's request, Majcher stood up and took a few steps toward Collins. *Id.* As Majcher approached, he was still holding his shotgun, albeit in a vertical position. *Id.* At that point, Collins aggressively repeated his command for Majcher to place his weapon on the ground; he simultaneously unholstered his service pistol and pointed it at Majcher. *Id.* Majcher then complied with Collins's request and placed his shotgun on the ground. *Id.* He approached the squad car with his hands raised to shoulder-height, identified himself, and explained that he and a friend—Stiegel—were fox hunting on the property with the property owner's permission. *Id.*

3

After Majcher mentioned Stiegel, Collins scanned the field using his personal flashlight and observed Stiegel holding a shotgun. *Id.* Collins then aimed his service weapon at Stiegel and instructed him to drop his shotgun or else he would be shot. *Id.* In Stiegel's deposition, he testified that he never saw a gun pointed at him because of the glare from Collins's flashlight. (Stiegel Dep., at 35–36). As Stiegel approached Collins and Majcher, Collins determined that both men were complying with his requests. *Stiegel*, 2014 WL 695571, at *2. He then holstered his firearm before Stiegel reached his car. *Id.* Collins inspected Stiegel's identification, the three men had a brief conversation, and then Collins left the scene. *Id.* at *3. The entire encounter lasted approximately five to ten minutes. *Id.* Neither Steigel nor Majcher was issued a citation, and the parties agree that the two men were legally hunting on the premises that evening. *Id.*

After the incident, Stiegel lodged both formal and informal complaints against Collins with the Peters Township Police Department. *Id.* at *3–4. The department conducted an internal investigation of the incident. *Id.* at *4. After the investigation concluded that Collins did not violate any department policies, Stiegel filed a three-count Complaint in federal district court alleging violations of his constitutional rights. *Id.* at *5. More specifically, Count I of the Complaint sought relief against Collins pursuant to 42 U.S.C. § 1983 for violating Stiegel's First and Fourteenth Amendment rights. Count II alleged that Peters Township was also liable for Collins's actions under 42 U.S.C. § 1983 because it had a policy, custom, or practice of acquiescing to this type of behavior. Count III sought relief from both defendants pursuant to 42 U.S.C. §§ 1985 and 1988.

4

By Memorandum and Order dated July 30, 2012, the District Court for the Western District of Pennsylvania denied a motion to dismiss filed by the defendants and partially granted their accompanying motion to strike certain paragraphs from the pleadings. *Stiegel v. Peters Twp.*, No. 2:12–cv–00377, 2012 WL 3096663, at *8 (W.D. Pa. July 30, 2012). At the close of discovery, the defendants moved for summary judgment. By Memorandum and Order dated February 24, 2014, the district court granted defendants' request and entered judgment for the defendants and against Stiegel. *Stiegel v. Peters Twp.*, No. 2:12–cv–377, 2014 WL 695571, at *11 (W.D. Pa. Feb. 24, 2014). Stiegel timely filed this appeal on March 14, 2014. On appeal, Stiegel argues (1) that Collins did not have reasonable suspicion to seize him, (2) that Collins used excessive force in effectuating the seizure, and (3) that Peters Township authorized Collins's actions and should therefore be held liable for them. For the following reasons, we reject each of these arguments. We therefore affirm the decision of the District Court granting summary judgment in favor of Collins and Peters Township.

## II. DISCUSSION[1]

### 1. Standard of Review

This Court exercises plenary review over a district court order granting summary judgment. *Bushman v. Halm*, 798 F. 2d 651, 656 (3d Cir. 1986). Therefore, our review is

---

[1] The District Court had jurisdiction to hear Stiegel's complaints of violations of his constitutional rights pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). We have jurisdiction to review the District Court's February 24, 2014, Order granting Collins's and Peters Township's motions for summary judgment pursuant to 28 U.S.C. § 1291.

identical to the review performed by the district court. *Id.* Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). When determining a motion for summary judgment, we must construe all evidence in the light most favorable to the plaintiff. *Anderson*, 477 U.S. at 261 n.2. We are also mindful that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

2.      *The Initial Stop*

Stiegel first argues that the District Court erred in finding that Collins was authorized under the law to conduct an investigatory stop of Stiegel. (Appellant Brief at 21). The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." U.S. Const. amend. IV. A person is "seized" for Fourth Amendment purposes when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

One type of police-citizen interaction that constitutes a seizure under the Fourth Amendment is an investigatory stop. *See Terry v. Ohio*, 293 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person."). Investigatory, or *Terry*, stops must be justified by reasonable suspicion. *Id.* at 21. Reasonable suspicion is measured through an analysis of the "totality of the circumstances" surrounding the investigatory stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the seizure]." *Terry*, 293 U.S. at 21. Reasonable suspicion is a less demanding standard than probable cause, yet it still requires more than an officer's mere suspicions or hunches. *Sokolow*, 490 U.S. at 7.

At the outset of our inquiry, we note that the parties do not contest the fact that a seizure occurred, as it is evident that a reasonable person in Stiegel's position on the night of January 30, 2012, "would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. In his Reply Brief, Stiegel briefly contends that his interaction with Collins amounted to a "*de facto*" arrest, which requires probable cause. We find that it did not. There is no bright-line rule establishing that an officer's display of his service

7

weapon automatically elevates an investigatory stop into an arrest. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 2005). There were no other elements of a typical arrest present in this case other than Collins's temporary use of his service weapon. Collins did not handcuff the men, he did not issue them a citation, and the entire encounter lasted only five to ten minutes. We therefore agree with the District Court that this encounter is best characterized as an investigatory stop. *Stiegel*, 2014 WL 695571, at *10.

We must accordingly determine whether Collins had reasonable suspicion to stop Stiegel. We find that he did. Collins personally saw a single vehicle parked in a strange and questionable position: "several hundred yards from any houses around 11:00 pm on an unlit dead-end road near an area where he encountered criminal activity in the past and where vehicles do not commonly park at night." *Stiegel*, 2014 WL 695571, at *1. Upon approaching the vehicle, Collins observed Majcher, who was carrying a shotgun. *Id.* at *2. Majcher did not immediately comply with Collins's requests to place his weapon on the ground. *Id.* After Majcher indicated that he was not alone in the area, Collins discovered Stiegel—a second armed individual in an area where Collins had personally observed criminal activity in the past.

We briefly note that Appellant's reliance on *Florida v. J.L.*, 529 U.S. 266 (2000), is misplaced. That case involved an officer acting solely on an anonymous tip that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Here, Collins was not acting on the basis of an anonymous tip that an individual had a gun; rather, he personally observed a suspicious scene. After he stopped to investigate the situation, he saw Majcher and Collins both carrying shotguns.

8

This situation is much different from the factual scenario at issue in *Florida v. J.L.* We therefore find that the totality of the circumstances surrounding the interaction between Stiegel and Collins demonstrates that there were "specific, articulable facts which, taken together with rational inferences from those facts, reasonably warranted [the seizure of Stiegel]." *Terry*, 293 U.S. at 21.

3.      *The Use of Force*

Stiegel next argues that Collins's act of pointing a gun at him as he left the woods and approached the squad car constituted excessive force. In *Graham v. Connor*, the Supreme Court held that the proper test for evaluating a claim of excessive force is one of objective reasonableness. 490 U.S. 386, 395 (1989). To determine objective reasonableness, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The Supreme Court has cautioned that this inquiry is fact specific and should be done on a case-by-case basis. *Id.* (citing *Garner*, 471 U.S. at 8–9).

Despite the fact-intensive nature of this inquiry, the Court has articulated three factors that serve as guideposts for determining whether the use of force was reasonable in a given case: (1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene. *Id.* This Circuit has found that other factors may be relevant as well, including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the

action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Several cases from this and other circuits have used the *Graham* factors to determine whether an officer's act of drawing his weapon during an encounter with a citizen was justified. These cases divide into two categories: (1) cases where an officer was justified in displaying his weapon because he reasonably perceived that he was in danger, and (2) cases where the display was not warranted because there was no threat to officer safety.

Several circuits have held that it is not a constitutional violation for a police officer to point a gun at an individual who poses a reasonable threat of danger or violence to police. One example of this situation occurred where an officer was alone with three individuals suspected of criminal activity. *Courson v. McMillian*, 939 F.2d 1479, 1483–84, 1496 (11th Cir. 1991). There, because the officer was outnumbered and the individuals were belligerent, the Eleventh Circuit found the officer was justified in displaying his weapon. *Id.* Similarly, this Circuit found that there was a reasonable threat of danger where officers were arresting four men who were suspected of drug involvement and violence. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). In *Sharrar*, we determined that the threat level posed by the situation was sufficient to justify "calling over twenty officers to the scene, including a SWAT team armed with machine guns and an FBI hostage negotiator." *Id.* at 821. While we acknowledged in *Sharrar* that the officers' conduct "appear[ed] to be more akin to the Rambo-type

10

behavior associated with police in overdramatized B movies or TV shows," we still found that it did not rise to the level of a constitutional violation. *Id.* at 822.

Similarly, courts have found that it is a constitutional violation for a police officer to point a gun at an individual who does not pose a reasonable threat of danger or violence to police. Several of these cases involved an officer drawing a weapon on an unarmed child. *See, e.g.*, *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2002) (en banc) (finding excessive force where officer trained a firearm on an infant during a sweep of a gang member's house); *Holland v. Harrington*, 268 F.3d 1179, 1192–93 (10th Cir. 2001) (finding excessive force where officers "continu[ed] to hold the children directly at gunpoint after the officers had gained complete control of the situation"); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992) (finding excessive force where officer held a gun to the head of a nine-year-old child who was not suspected of any crime during a search of the child's family home).

Other cases have found excessive force where officers train their guns on compliant adults who pose no threat to the safety of the police. For example, the Seventh Circuit found excessive force where an officer, in the course of executing a search warrant based on a nonviolent crime, "wield[ed] a 9–millimeter submachine gun, which he used to detain various people at the search site." *Baird v. Renbarger*, 576 F.3d 340, 342, 344–45 (7th Cir. 2009). Other courts have found excessive force in similar circumstances. *See, e.g.*, *Robinson v. Solano Cty.*, 278 F.3d 1007, 1010, 1014 (9th Cir. 2002) (finding excessive force where two officers pointed guns from point-blank range at the head of individual suspected of a misdemeanor); *Baker v. Monroe Twp.*, 50 F.3d

11

1186, 1193–94 (3d Cir. 1995) (finding excessive force where police held suspect's family members, two of whom were minors, on the ground at gunpoint while they searched the alleged suspect's house); *Brown v. City of Milwaukee*, 288 F. Supp. 2d 962, 972–73 (E.D. Wisc. 2003) (finding excessive force where police surrounded suspect's car, pointed multiple guns at her, shouted obscenities, used sensory overload tactics, and injured suspect).

Viewing Stiegel's claim through the lens of the *Graham* test, we note first that the government has a strong interest in ensuring that police are not forced to subject themselves to unreasonable danger while carrying out their duties. We use the *Graham* factors to determine whether the intrusion on Stiegel outweighed that interest in this case. When Collins approached Majcher, he suspected that Majcher may be preparing for a home invasion or suicide. Both of these activities are severe and violent; however, it is unclear whether Collins still suspected the men of home invasion or suicide when he trained his gun on Stiegel. Therefore, the first factor is inconclusive in this instance. However, the second and third *Graham* factors weigh in favor of using force, as Stiegel and Majcher outnumbered Collins, were both armed with shotguns, and Majcher did not immediately comply with Collins's request to place his weapon on the ground.

The additional factors described by this Circuit in *Sharrar* also compel a finding that Collins's use of force was justified. First, from Collins's perspective, there was a possibility that Stiegel and Majcher were violent or dangerous, as Collins came across them at night, in a remote location that he associated with criminal activity. Further, Collins did not arrest either suspect, and the entire encounter between Collins and the two

12

men lasted only five to ten minutes. Finally, both Stiegel and Majcher were armed, and they outnumbered Collins.

We also note that the situation in this case is more akin to the cases from this and other circuits that have found that an officer's display of a weapon was justified than to the cases that found excessive force. In this case, both suspects were adult men. *Cf. Motley*, 432 F.3d at 1089 (excessive force where officer pointed gun at infant); *Holland*, 268 F.3d at 1192–93 (excessive force where officer pointed gun at children); *McDonald*, 966 F.2d at 294–95 (excessive force where officer pointed gun at nine-year-old). Further, the officer, Collins, was outnumbered by Stiegel and Collins. *See Courson*, 939 F.2d at 1483–84 (display of gun justified where officer was outnumbered). Both suspects were also armed. *Cf. Robinson*, 278 F.3d at 1015–16 (finding excessive force where officer pointed gun at unarmed suspect). Majcher did not immediately comply with Collins's request to disarm. *Cf. Baird*, 576 F.3d at 346 ("[P]ointing a gun at a *compliant* adult in a non-threatening situation . . . can also constitute excessive force." (emphasis added)). Finally, Collins's use of his service weapon was limited—he displayed it for a short amount of time and holstered it once the situation was under control. *Cf. Brown*, 288 F. Supp. 2d at 972–73 (police used sensory overload tactics, shouted obscenities at suspect, pointed multiple guns at her, and caused physical injury to her).

In assessing the objective reasonableness of Collins's actions, we remember that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

13

particular situation." *Graham*, 490 U.S. at 396–97. We therefore find that the totality of the circumstances in this instance, even where we construe all facts in favor of Stiegel, indicates that Collins was justified in temporarily unholstering his weapon and training it on both men while he assessed and gained control over the situation. He was similarly justified in placing his weapon back in its holster once he was comfortable that both men were cooperating. For these reasons, we agree with the District Court's finding that no excessive force was used in this case.

### 4. *Stiegel's* Monell *Claim*

Stiegel also appeals the District Court's grant of summary judgment in favor of Peters Township. Specifically, Stiegel argues that Peters Township should be liable for Collins's actions because it authorized them. However, the Supreme Court has held that courts cannot "authorize[ an] award of damages against a [municipality] based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Because we find that Stiegel has not suffered any constitutional harm at the hands of Collins, "the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id.*

### III.   CONCLUSION

For the foregoing reasons, we will affirm.

14