446 F.3d 483
 Pamela A. COUDEN; Tiffany A. Couden; Adam R. Couden, a minor, by his next friend, Pamela A. Couden; Nicholas M. Couden, a minor, by his next friend, Pamela A. Couden; Jordan T. Couden, a minor, by his next friend, Pamela A. Couden; Luke J. Couden, a
 minor, by his next friend, Pamela A. Couden; and Micah J. Couden, a minor, by his next friend, Pamela A. Couden, Appellants,
v.
Scott DUFFY; James C. Armstrong; Jay Freebery; Liam Sullivan; Two Unknown Named Agents of the Federal Bureau of Investigation; New Castle County; the New Castle County Department of Police; City of Wilmington; City of Wilmington Police Department; *United States of America, (*Amended Per Clerk's Order of 4/7/04).
 
 No. 4-1732.
 United States Court of Appeals, Third Circuit.
 Argued September 29, 2005.
 Filed May 1, 2006.
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED William D. Fletcher, Jr., Noel E. Primos (Argued), Schmittinger & Rodriguez, P.A., Dover, DE, for Appellants.
 Judith A. Hildick, Michele D. Allen (Argued), New Castle County Law Department, New Castle, DE, for Appellees Jay Freebery, James Armstrong, New Castle County, and New Castle County Department of Police.
 Colm F. Connolly, United States Attorney, Rudolph Contreras (Argued), Assistant United States Attorney, Office of the United States Attorney, Wilmington, DE, for Appellees Scott Duffy and the United States of America.
 Rosamaria Tassone (Argued), City of Wilmington Law Department, Wilmington, DE, for Appellees Liam Sullivan, City of Wilmington, and Wilmington Department of Police.
 Before: RENDELL, FUENTES, and WEIS, Circuit Judges.
 FUENTES, Circuit Judge.
 
 
 1
 In the hopes of catching a fugitive wanted for drug and weapons offenses, federal and local law enforcement officers set up undercover surveillance outside a home in Newark, Delaware. During the surveillance, plaintiff-appellant Pamela Couden, who lived near the target house, pulled up in front of her home with five of her children in her car. Couden's 14 year-old son got out of the car to leave his skateboard in the garage and to summon his sister from the house. Before realizing they had the wrong person, the officers approached the Couden car with guns drawn, then entered the Couden home where they tackled and handcuffed Couden's son.[1] The Coudens filed suit against the officers and various government entities, claiming constitutional and state common law violations. Concluding that the officers' conduct was reasonable, the District Court granted summary judgment in favor of all defendants. We conclude that the District Court erred in failing to consider the facts in the light most favorable to plaintiffs. We reverse in part, affirm in part, and remand for further proceedings.
 
 BACKGROUND
 
 2
 The relevant facts are as follows. On April 12, 2001, members of the Delaware Joint Violent Crime Fugitive Task Force set up surveillance near 7 Sanford Drive in Newark, Delaware, based on a tip that a fugitive wanted by the New Castle County Police Department for drug and weapons-related charges might be staying at that address. The Task Force was made up of both state and federal officers, and the members at the scene were defendant-appellees Scott Duffy of the Federal Bureau of Investigation (FBI), James Armstrong and Jay Freebery of the New Castle County Police Department, and Liam Sullivan of the Wilmington Police Department. The members of the Task Force were parked in two unmarked vehicles and wore plain clothes.
 
 
 3
 At about 8:30 p.m., Pamela Couden drove up to her home at 3 Sanford Drive, two houses away from 7 Sanford Drive, with five of her children — plaintiff-appellants Micah, age 5, Luke, 7, Jordan, 9, Nicholas, 11, and Adam, 14. Couden's daughter, 17 year-old Tiffany, was inside the residence. Couden parked on the street and kept her lights on and the engine running while Adam exited the car. According to Couden, she was waiting for Adam to put his skateboard in the garage and summon his sister, and the family then planned to go out to dinner. Adam walked into the garage, where he put down his skateboard and looked through a window from the garage into the house. He saw Tiffany through the window and started to leave the garage. At that time, he saw a man charging towards him with a gun. Frightened, he slammed the garage door shut, remaining inside.
 
 
 4
 Meanwhile, Pamela Couden pulled her car into the driveway, put her high beams on, and blew the horn to summon Adam. She then saw an unknown man — later determined to be Officer Armstrong — walking towards her with a gun. When he reached the car he pointed the gun at Pamela Couden and pulled the door handle without displaying a badge or identifying himself in any way. Not realizing that the man was an officer, Couden tried to escape. She pressed the gas pedal, swerved to avoid the garage, and swerved again to avoid a tree. She then saw a second man — later determined to be Officer Freebery — running towards the car pointing a gun at her and holding a flashlight above his head. As Couden drove past Officer Freebery, he threw the flashlight at a window of the car, shattering the glass. The children screamed from the back seat of the car, and Couden believed that one of them had been shot. Couden continued driving to a neighbor's house and drove over the curb, breaking the car's steering column. She ran into the neighbor's house and called 9-1-1.
 
 
 5
 From where he was standing inside the garage, Adam Couden heard his mother and brothers screaming "he's got a gun!" and then saw the family car drive across the yard with tires screeching. He then heard the sound of glass shattering.
 
 
 6
 Tiffany testified that, from inside the house, she saw a man with a gun approach the sliding-glass rear door to the house. The man tried to open the door, and when he saw Tiffany, he showed her what she thought was a badge and demanded entry. Tiffany testified that the man entered the house, but she did not specify whether she let him in or whether he forced his way in. A second man followed the first man into the house, and told Tiffany that there was a robber in the house. One of the men proceeded down the hallway, yelling "Come out with your hands up!" A third man then entered and headed toward the garage, and Tiffany heard someone yell "we got him" from the area of the garage and kitchen. Two of the men brought Adam into the house from the garage and threw him on the floor, where four men participated in pushing his head down, pointing guns at him, and spraying him with mace. They then handcuffed him.[2] Tiffany told the men that Adam was her brother, and they demanded a driver's license from Adam. Adam said that he was too young to have a driver's license. The men then left the house. About twenty minutes later, they returned and removed Adam's handcuffs.
 
 
 7
 Later that evening, Officers Armstrong and Freebery spoke to Pamela Couden and explained that a surveillance team was working undercover in the neighborhood, and that they had mistakenly assumed that Adam was the fugitive whom they were seeking. Officer Armstrong also admitted to Couden that he had seen the children in the back seat when he approached her vehicle.
 
 
 8
 Couden and the six children filed suit against the officers, the City of Wilmington, the Wilmington Police Department, New Castle County, and the New Castle County Police Department in the United States District Court for the District of Delaware in April 2003. They claimed violations of their rights under the Fourth and Fifth Amendments to the United States Constitution, and they proffered state common law claims of intentional and negligent infliction of emotional distress, assault and battery, false imprisonment, trespass, and wanton negligence. The complaint was originally filed against Agent Duffy and "unknown named agents of the FBI," but after defense counsel provided plaintiffs with the names of the local officers involved in the relevant events, plaintiffs filed an amended complaint naming as defendants James Armstrong, Jay Freebery, Liam Sullivan, the New Castle County Police Department, New Castle County, the City of Wilmington, and the City of Wilmington Police Department. After exhausting their administrative remedies under the Federal Tort Claims Act (FTCA) in November 2003, plaintiffs added the United States as a defendant.
 
 
 9
 Agent Duffy, Officer Armstrong, Officer Freebery, New Castle County, and the New Castle County Police Department filed motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative for summary judgment. The United States also filed a motion to dismiss. Officer Sullivan, the City of Wilmington, and the Wilmington Police Department did not make any dispositive motions. Plaintiffs filed a motion under Rule 56(f), requesting an opportunity to take further discovery. The District Court considered all dispositive motions filed by defendants as motions for summary judgment, and granted judgment to all defendants, including, sua sponte, to Sullivan, the City of Wilmington and the Wilmington Police Department. Couden v. Duffey, 305 F.Supp.2d 379, 385, 392-93 (D.Del.2004). The Court also denied plaintiffs' 56(f) motion. Id. at 393. This appeal followed.[3]
 
 DISCUSSION
 
 10
 I. Constitutional Claims Against the Individual Defendants
 
 
 11
 Under 42 U.S.C. § 1983, an individual may bring a suit for damages against any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the United States Constitution or federal law. Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir.2005). A parallel right of action against federal officials exists under the Supreme Court's holding in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). See Brown v. Philip Morris Inc., 250 F.3d 789, 800 (3d Cir.2001). Here, plaintiffs have brought suit against Officers Armstrong, Freebery, and Sullivan under § 1983, and against Agent Duffy under Bivens, claiming that their rights were violated under the Fourth and Fifth Amendments to the United States Constitution. The District Court did not consider the Fifth Amendment claim, however, and plaintiffs do not argue it in their briefs before this Court. We therefore hold that any Fifth Amendment claim is waived. See United States v. Pelullo, 399 F.3d 197, 222 (3d Cir.2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."). Under the Fourth Amendment, plaintiffs claim that the four officers (1) unlawfully searched the Couden residence, (2) unlawfully seized six of the seven plaintiffs (Pamela Couden and four children in the car, and Adam Couden in the Couden residence), and (3) used excessive force against Adam Couden.[4]
 
 
 12
 Under certain circumstances, government officials are protected from Bivens and § 1983 suits by qualified immunity. In the context of Fourth Amendment claims, qualified immunity operates to "protect officers from the sometimes `hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting Priester v. Riviera Beach, 208 F.3d 919, 926 (11th Cir.2000) (internal citation omitted)). In considering whether qualified immunity applies, a court must first decide whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation. Curley v. Klem, 298 F.3d 271, 277 (3d Cir.2002) (citing Saucier, 533 U.S. at 201, 121 S.Ct. 2151). If so, the court next determines whether the constitutional right in question was clearly established. Id. at 277 (citing Saucier, 533 U.S. at 201, 121 S.Ct. 2151). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, 121 S.Ct. 2151. "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Id. at 205, 121 S.Ct. 2151.
 
 A. Analysis by the District Court
 
 13
 The District Court found that the individual defendants did not violate plaintiffs' constitutional rights, and it therefore did not reach the question of whether the rights were clearly established. See Couden, 305 F.Supp.2d at 387-90. We conclude that in its constitutional rights analysis, the District Court failed to consider the facts in the light most favorable to the plaintiffs. Initially, the District Court reported defendants' version of Adam Couden's behavior:
 
 
 14
 Defendants claim that . . . a white male, later identified as Adam Couden . . . , got out of the vehicle, proceeded to the rear of Plaintiff's residence, and looked into several windows in the rear of the house. Defendants state that Adam continued to peer into the windows while hiding behind objects in the back yard, and then attempted to open the rear sliding glass door, but could not gain entry. According to Defendants, Adam looked around to the left and right as if he was making sure no one could see him, and then quickly entered another rear door.
 
 
 15
 Id. at 382 (citations to the record omitted). The District Court did not present plaintiffs' contradictory version of these details, and went on to explicitly adopt defendants' recital of the facts in considering whether a constitutional violation had occurred. The District Court stated, for example, that "there is no dispute that Adam . . . looked in the rear windows before entering the house," and that based on this fact, among others, Officers Armstrong and Freebery acted reasonably in approaching the house to investigate. Id. at 388. In its discussion of plaintiffs' seizure claim, the District Court similarly noted that
 
 
 16
 it is undisputed that Officers Armstrong and Freebery witnessed Adam approach the house from the rear, and peek into the rear windows of the house. It is also undisputed that Adam could not gain entry after opening the rear sliding glass door, and that he entered another rear door after looking around to the left and right as if he was making sure no one could see him.
 
 
 17
 Id. at 389. The Court concluded that this "suspicious behavior," coupled with the officers' belief that Adam was the fugitive whom they were seeking, "was sufficient to give the Officers reasonable suspicion of criminal activity," and thus to justify the seizure of Pamela Couden and the children in the car under the Fourth Amendment. Id.
 
 
 18
 All of these facts as recited by the District Court are disputed by plaintiffs. In his affidavit, Adam Couden stated that he simply walked into the garage, put his skateboard on a bench, and looked through a window from the garage into the house. He then began to exit the garage, and saw a man "charging" towards him with a gun. Adam does not admit to looking through multiple windows, attempting to gain entry through a rear glass door of the house, or "looking around to the left and right as if he was making sure no one could see him."
 
 
 19
 In addition, the District Court failed to take into account several of plaintiffs' allegations favorable to their claim. Pamela Couden stated that when she pulled into her driveway, she put her car's high beams on and blew the horn. Plaintiffs reasonably argue that such behavior is uncharacteristic of a getaway car, but the District Court did not mention this element of plaintiffs' account. The Court also failed to note Couden's allegation that after the misunderstanding was discovered, Officer Armstrong admitted to her that he had seen the four children sitting in the car when he initially approached. While this point is hardly definitive, it supports plaintiffs' argument that Officer Armstrong acted unreasonably when he approached the vehicle with his weapon raised.
 
 
 20
 In sum, it is clear that the District Court did not consider the facts in the light most favorable to the plaintiffs as required when analyzing a summary judgment record, and that this error significantly influenced the Court's findings. We next consider whether summary judgment is appropriate under a proper view of the record, examining in turn the seizure of Pamela Couden and the children in the car, the entry into the Couden residence, and the seizure of Adam Couden.
 
 
 21
 B. Seizure of Pamela Couden and the Children in the Car
 
 
 22
 Considering the facts in the light most favorable to the plaintiffs, Armstrong's conduct gave rise to an unconstitutional seizure under the Fourth Amendment when he approached the Couden vehicle with gun drawn. The federal defendants suggest that the plaintiffs in the car were never "seized" for purposes of the Fourth Amendment because Pamela Couden drove away when Officer Armstrong approached the car. Generally, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person." Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here, Officer Armstrong clearly restrained the freedom of Couden and her children when he approached them, pointed a gun at Couden, and tried to open one of the doors to the car. However, "if the police make a show of authority and the suspect does not submit, there is no seizure." United States v. Valentine, 232 F.3d 350, 358 (3d. Cir.2000); see also id. at 353, 359 (holding that no seizure occurred where an officer told Valentine to approach and to put his hands on the squad car, and Valentine responded "Who, me?" before attempting to run away). That reasoning does not apply here, however, because Couden alleges that Officer Armstrong never declared himself to be a police officer and never displayed a badge. There was thus no "show of authority" by Officer Armstrong, and Couden could not have been expected to "submit." Under these circumstances, it would be unreasonable to find that Couden's flight negated the seizure. We hold that a seizure did occur for purposes of the Fourth Amendment.
 
 
 23
 Generally, a seizure is reasonable only where it is justified by a warrant or probable cause. Shuman, 422 F.3d at 147. An officer without a warrant or probable cause may, however, conduct a "Terry stop" — a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing Terry, 392 U.S. at 30, 88 S.Ct. 1868). Under the reasonable suspicion standard, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry, 392 U.S. at 21, 88 S.Ct. 1868.[5]
 
 
 24
 Defendants argue that Officer Armstrong had a reasonable suspicion of criminal activity based on Adam Couden's strange behavior, and that Officer Armstrong reasonably believed that the vehicle parked near the house was a getaway car. In determining whether the reasonable suspicion standard is satisfied, a court must "consider the totality of the circumstances, including the police officer's knowledge, experience, and common sense judgments about human behavior." United States v. Robertson, 305 F.3d 164, 167 (3d Cir.2002). Since the Couden residence was not the house under surveillance, the officers had no reason to believe that Adam Couden was the fugitive they were seeking. Nor was it reasonable, under the plaintiffs' description of the facts, for the officers to assume that Adam was a burglar.[6] Adam stated that he was carrying a skateboard and walked directly into the garage, where he put down the skateboard and looked through a window into the house. The car contained four small children, ranging in age from five to eleven years old, who should have been visible to Officer Armstrong at least by the time he reached the car and began pulling on the door handle. Pamela Couden states that when she pulled her car into the driveway, she turned on her car's high beams and honked. None of these facts is suggestive of unlawful conduct. While it is true that a "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," United States v. Ubiles, 224 F.3d 213, 217 (3d Cir.2000), the officers here must point to some specific articulable basis for their suspicion. They have not done so, and no set of reasonable inferences from the behavior witnessed by the officers provides such a basis. See Johnson v. Campbell, 332 F.3d 199, 208 (3d Cir.2003) ("There are limits . . . to how far police training and experience can go towards finding latent criminality in innocent acts.").[7] Under the facts as presented by plaintiffs, Officer Armstrong's seizure of the plaintiffs in the car was therefore unconstitutional.[8]
 
 
 25
 Moreover, the right violated was "clearly established" under the test articulated by the Supreme Court in Saucier. In deciding whether a right is clearly established, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201, 121 S.Ct. 2151. A grant of qualified immunity may be upheld where a challenged police action presents an unusual legal question or "where there is `at least some significant authority' that lends support" to the conduct in question, even if the conduct was unconstitutional. Doe v. Groody, 361 F.3d 232, 243 (3d Cir.2004) (citation omitted). "On the other hand, the plaintiff need not show that there is a prior decision that is factually identical to the case at hand in order to establish that a right was clearly established." Id.
 
 
 26
 We hold that it would have been clear to a reasonable officer that the conduct observed by Officers Armstrong and Freebery — a young man exiting a car parked near a house, walking from the car into the garage of the house while carrying a skateboard and then looking into a window of the house, and the car then driving into the driveway of the house, turning on its brights, and honking — do not provide the reasonable suspicion of illicit activity necessary for a Terry stop. There is simply nothing suspicious in this series of actions, and plaintiffs have not pointed to any legal authority that might cloud the issue. Cf. Johnson, 332 F.3d at 209 (finding no reasonable suspicion to support a Terry stop where the subject was "drinking coffee, flipping through a newspaper, pacing, and rubbing his head"). Although reasonable suspicion cases are inherently fact-based, we find that based on relevant precedent, the lack of a specific articulable suspicion should have been apparent to a reasonable officer in Officer Armstrong's position. Thus, Officer Armstrong is not entitled to qualified immunity for his unconstitutional seizure of Pamela Couden and the children in the car.
 
 C. Search of the Couden Residence
 
 27
 A search of a home without a warrant is presumptively unreasonable under the Fourth Amendment. Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). There are several established exceptions to the warrant requirement, however, including exigent circumstances and consent. Steagald v. United States, 451 U.S. 204, 211, 101 S.Gt. 1642, 68 L.Ed.2d 38 (1981). Regardless of whether an exception applies, a warrantless search generally must be supported by probable cause. New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).
 
 
 28
 Exigent circumstances exist where "officers reasonably . . . believe that someone is in imminent danger." Parkhurst v. Trapp, 77 F.3d 707, 711 (3d Cir. 1996) (emphasis omitted). For example, a search may be justified based on exigent circumstances by "hot pursuit of a fleeing felon," "imminent destruction of evidence," or "the need to prevent a suspect's escape." Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (quoting lower court holding with approval). Defendants argue that the officers in this case reasonably believed that Tiffany Couden was in imminent danger because they saw an unknown man enter the house, and they believed him to be either a burglar or a wanted fugitive. In addition, they state that Tiffany told them that she was alone in the house, confirming their suspicion that the man was an intruder. Lastly, Pamela Couden's seemingly desperate drive away from the scene suggested some type of illicit behavior.
 
 
 29
 This is a close issue. As discussed previously, Adam Couden did not initially behave in a suspicious manner, and the vehicle parked by the road did not behave like a getaway car. Once the vehicle sped away, however, the officers were reasonable in their concern and their decision to approach the house to investigate further. Tiffany's apparent belief that no one else was home properly increased their concern. We hold that these facts, taken together, provided both the probable cause and exigent circumstances necessary for a warrantless search of the house.[9]
 
 D. Excessive Force Against Adam Couden
 
 30
 The use of excessive force is itself an unlawful "seizure" under the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004). In deciding whether challenged conduct constitutes excessive force, a court must determine the objective "reasonableness" of the challenged conduct, considering "`the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Carswell, 381 F.3d at 240 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). Other factors include "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir.1997). In evaluating reasonableness, the court must take into consideration the fact that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. 1865. Thus, the court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer on the scene." Id. at 396, 109 S.Ct. 1865.
 
 
 31
 Adam and Tiffany Couden state that four officers jumped on Adam, pointed guns at his head, handcuffed him, and sprayed him with mace. One of the officers was on top of Adam with his knee in Adam's back. Although the officers may have believed that Adam was an intruder at the time, this level of force was unnecessary and constitutionally excessive. There was no evidence that Adam was resisting arrest or attempting to flee, and in his affidavit he stated that he "did what [the officers] told [him] to do" because he knew he was "one against a group." The police had no reason to believe that Adam was armed or that any accomplice was present, and there were four officers available to subdue him if he became violent. The participation of so many officers and the use of mace, several guns pointed at Adam's head, and handcuffs constituted excessive force against a cooperative and unarmed subject.
 
 
 32
 Moreover, the constitutional right in question was clearly established under the qualified immunity test. The factors relevant to the excessive force analysis are well-recognized, as described above. See Sharrar, 128 F.3d at 822; cf. Estate of Smith v. Marasco, 430 F.3d 140, 150 (3d Cir.2005) (noting that a "reasonable officer would be guided by the Sharrar factors in determining whether to use overwhelming force in a given situation," and that "if an officer applies the Sharrar analysis in an unreasonable manner, he is not entitled to qualified immunity"). In this case, most of these factors — including the potential threat posed by the suspect, whether the suspect was resisting arrest, armed, or attempting to flee, and the ratio of officers to suspects — clearly suggested the use of a low level of force.
 
 
 33
 Thus, based on relevant precedent at the time, a reasonable officer would not have believed that the level of force used against Adam Couden was legal under the circumstances. See Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir.1995) (finding liability for excessive force where officers pointed guns at and handcuffed several members of a family where there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used"); Robinson v. Solano County, 278 F.3d 1007, 1015 (9th Cir.2002) (en banc) (finding the law sufficiently established in 2002 to recognize the "general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation" can constitute excessive force, "especially where the individual poses no particular danger"). Cf. Sharrar, 128 F.3d at 822 (finding that although police officers "came close to the line," there was no use of excessive force where multiple officers used "Rambo-type behavior" in arresting four men allegedly involved in a particularly violent domestic assault, where a gun was unaccounted for and there was "some suggestion" of involvement with drugs). We conclude that the four individual defendants in this case are not entitled to qualified immunity as to the unconstitutional seizure of Adam Couden.
 
 
 34
 II. Common Law Claims Against the Individual Defendants
 
 
 35
 Plaintiffs also make common law claims against defendants Armstrong, Freebery, and Sullivan based on intentional infliction of emotional distress, assault and battery, false imprisonment, trespass, and wanton negligence.[10] The District Court concluded that these defendants are immune from liability under the Delaware Tort Claims Act, Del.Code Ann. tit. 10 § 4011 (2005), and we agree.
 
 
 36
 The Delaware Tort Claims Act states that "[e]xcept as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages."[11] Del.Code Ann. tit. 10 § 4011(a). Plaintiffs argue, however, that a statutory allowance for suit exists under Del.Code Ann. tit. 10 § 4011(c), which states:
 
 
 37
 An employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent.
 
 
 38
 This provision is not applicable here, because plaintiffs cannot establish that the officers' acts "were not within the scope of employment" or "were performed with wanton negligence or willful and malicious intent." In conducting surveillance, the officers were clearly acting within the scope of their official duties. Moreover, viewing the facts in the light most favorable to the plaintiffs, the officers' conduct may have been overzealous but it was not malicious or willful. Under Delaware law, conduct is "wanton" only where it reflects a "`conscious indifference'" or an "`I-don't-care' attitude." Foster v. Shropshire, 375 A.2d 458, 461 (Del.1977) (citation omitted). As a matter of law, no such conduct can be inferred in this case. We therefore affirm the District Court's grant of summary judgment as to plaintiffs' common law claims against defendants Armstrong, Freebery, and Sullivan.
 
 
 39
 III. Claims Against the Institutional Defendants
 
 A. The United States
 
 40
 Plaintiffs raise an FTCA claim against the United States, apparently based on both constitutional and state common law grounds. The FTCA waives the federal government's sovereign immunity as to negligent or wrongful actions by its employees within the scope of their official duties, where "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).
 
 
 41
 As defendants note, the United States is not liable under the FTCA for money damages for suits arising out of constitutional violations. See, e.g., F.D.I.C. v. Meyer, 510 U.S. 471, 477-78, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); Williams v. United States, 242 F.3d 169, 175 (4th Cir. 2001); Roundtree v. United States, 40 F.3d 1036, 1038 (9th Cir. 1994); Castro v. United States, 34 F.3d 106, 110 (2d Cir.1994). Plaintiffs' constitutional claims against the United States were therefore properly dismissed.
 
 
 42
 As for plaintiffs' common law claims, an FTCA action could in principle be based on the actions of Agent Duffy. Although the FTCA waiver of immunity generally does not apply to claims of assault, battery, false imprisonment, false arrest, and malicious prosecution, among other intentional torts, that rule is not applicable to investigative or law enforcement officers. See 28 U.S.C. § 2680(h). Plaintiffs did not assert common law claims against Agent Duffy in their complaint, however. There is therefore no basis in the complaint for an FTCA claim based on Agent Duffy's actions.
 
 
 43
 Plaintiffs also contend that their FTCA action may proceed based on the actions of Officers Armstrong, Freebery, and Sullivan. Plaintiffs reason that while these officers are not formally federal employees, they were acting as federal employees in their work on the Joint Task Force with members of the FBI. This claim must fail. First, plaintiffs themselves have sued the three officers under § 1983, a statute that does not apply to federal actors. See West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (stating that a § 1983 claimant must show that the alleged deprivation was committed by a person acting "under color of state law"). Second, defendants state that at the time of the conduct in question here, the officers were conducting surveillance in an attempt to capture a fugitive wanted by the New Castle County Police Department, not by the federal government, and plaintiffs have not disputed this assertion. The investigation originated with New Castle County, and was passed on by that police department to the Joint Task Force. Nothing in the record suggests that the actions of the three officers were taken on behalf of the federal government. See 28 U.S.C. § 2671 (stating that employees of the federal government include "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States"). The conduct of those officers therefore cannot form the basis of a claim against the United States.
 
 
 44
 Thus, we affirm the grant of summary judgment as to plaintiffs' FTCA claims.
 
 
 45
 B. New Castle County, the New Castle County Police Department, the City of Wilmington, and the Wilmington Police Department
 
 
 46
 Plaintiffs also assert a § 1983 claim against New Castle County, the New Castle County Police Department, the City of Wilmington, and the Wilmington Police Department. We discern no error in the District Court's grant of summary judgment as to these defendants. The Supreme Court has held that a suit under § 1983 may not be maintained against a local government for an injury inflicted by its employees. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Instead, it is when execution of a government's policy or custom. . . inflicts the injury that the government as an entity is responsible under § 1983." Id. This rule also applies to police departments. See, e.g., Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 791 (3d. Cir.2000); McCullah v. Gadert, 344 F.3d 655, 662 (7th Cir.2003). Plaintiffs have alleged no facts supporting the claim that policies or customs of the municipal defendants in this case caused the injuries alleged by plaintiffs. Summary judgment was therefore proper as to these defendants.
 
 IV. Grant of Summary Judgment sua sponte
 
 47
 Officer Sullivan, the City of Wilmington, and the Wilmington Police Department did not file dispositive motions in this case, and plaintiffs argue that the District Court erred by granting summary judgment sua sponte to those parties. "It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment sua sponte." Gibson v. Mayor and Council of Wilmington, 355 F.3d 215, 222 (3d Cir. 2004). The court may not enter judgment, however, without "placing the adversarial party on notice that the court is considering a sua sponte summary judgment motion" and providing that party "an opportunity to present relevant evidence in opposition to that motion." Chambers Dev. Co. v. Passaic County Util. Auth., 62 F.3d 582, 584 n. 5 (3d Cir.1995); see also Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903, 910 (3d Cir.1994). Notice is satisfied if "`the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" Gibson, 355 F.3d at 223-24 (quoting Leyva v. On the Beach, Inc., 171 F.3d 717, 720 (1st Cir.1999) (internal citation and quotation marks omitted)).
 
 
 48
 We affirm the District Court's sua sponte grants in this case as to those holdings for which the issue is not mooted by our other rulings — namely, the District Court's dismissal of the common law claims against Officer Sullivan and its dismissal of the § 1983 claims against the City of Wilmington and the Wilmington Police Department. Although "the sua sponte grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims," Gibson, 355 F.3d at 224, we find that the requirements for a sua sponte grant are satisfied here. The Court's grounds for dismissal of the common law claims against Officer Sullivan were identical to those for Officers Armstrong and Freebery, who did file motions for summary judgment. Similarly, the District Court's grounds for dismissal of the claims against Wilmington and the Wilmington Police Department were identical to those for New Castle County and the New Castle County Police Department, which also filed motions for summary judgment. Plaintiffs therefore had notice of all of the issues that the District Court would reach and had a fair opportunity to address them in full.[12]
 
 V. Conclusion
 
 49
 Based on the reasoning above, we reverse the District Court's grant of summary judgment as to plaintiffs' § 1983 claims against Officers Armstrong, Freebery, and Sullivan, and plaintiffs' Bivens claim against Agent Duffy. We affirm the grant of summary judgment as to plaintiffs' common law claims against Officers Armstrong, Freebery, and Sullivan, and against Agent Duffy. We also affirm the grant of summary judgment as to all claims against defendants Wilmington Police Department, City of Wilmington, New Castle County Police Department, and New Castle County. Lastly, we affirm the grant of summary judgment as to plaintiffs' claims against the United States under the FTCA.
 
 
 
 Notes:
 
 
 [1]
 Many of the relevant facts in this case are in dispute. Because this case is at the summary judgment stage, we view the facts in the light most favorable to the plaintiffsSee Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir.2002).
 
 
 [2]
 Plaintiffs suggest that the four men who jumped on Adam were Officers Armstrong, Freebery, and Sullivan, and Agent Duffy. Agent Duffy states, however, that he and Officer Sullivan did not arrive until after Adam Couden was handcuffed. Based on the testimony of Tiffany Couden that four men tackled Adam Couden, together with defendants' assertion that no one besides Armstrong, Freebery, Duffy, and Sullivan was involved in the events of that night, this Court will presume for purposes of summary judgment that Agent Duffy and Officer Sullivan did participate in the capture of Adam Couden
 
 
 [3]
 Our review of a grant of summary judgment is plenary, and we apply the same standard that the district courts apply at summary judgmentDilworth v. Metro. Ins. Co., 418 F.3d 345, 349 (3d Cir.2005). Thus, we draw all reasonable inferences in favor of the non-moving party, and affirm a grant of summary judgment only when "`there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed.R.Civ.P. 56(c)). The District Court had jurisdiction over the federal claims in this case under 28 U.S.C. § 1331, and over the related state law claims under 28 U.S.C. § 1367(a). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 [4]
 Agent Duffy argues that the case against him should be dismissed because plaintiffs failed to allege that he was personally involved in any of the relevant events. Plaintiffs alleged in their complaint that "four of the Defendants entered the home with firearms" and "[s]ubsequently, the Defendants grabbed Plaintiff Adam Couden, pulled him into the house and pushed him to the floor. . . ." As noted above, we presume that Agent Duffy was one of these four officers. Plaintiffs therefore have alleged sufficient facts about Agent Duffy's involvement in the case to survive a motion to dismiss
 
 
 [5]
 Although an approach with weapons drawn does not automatically escalate aTerry stop into an arrest, it may do so in certain circumstances, depending on "the intrusiveness of all aspects of the incident in the aggregate." Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir.1995). We need not decide whether Officer Armstrong's seizure of Couden and her children amounted to an arrest, because we find that the seizure was unconstitutional even under the lower "reasonable suspicion" standard applicable to a Terry stop.
 
 
 [6]
 Pamela Couden states that the individual defendants told her at the end of the evening that they had mistakenly believed Adam to be the fugitive under surveillance. Defendants insist that they did not believe that Adam was the fugitive, but instead thought him to be a common burglar. This Court need not consider which view presents the case in the light most favorable to the plaintiffs, as the defendants lacked reasonable suspicion under either view
 
 
 [7]
 Even if Officer Armstrong harbored some reasonable concerns about what he saw, it was unnecessary to approach the car silently with gun drawn. Instead, he could have presented his badge to Pamela or Adam Couden and questioned them, or he could have run the car's license plate through the police database and found that it matched the residence. While the fact that Officer Armstrong could have used less intrusive measures does not automatically render the seizure unreasonable, it is a relevant factor in considering the constitutionality of Officer Armstrong's conductSee Hedges v. Musco, 204 F.3d 109, 120 (3d Cir.2000).
 
 
 [8]
 Officer Armstrong's conduct may also have constituted an unconstitutional seizure under the excessive force doctrine, given that the occupants of the car showed no potential for dangerous behaviorSee Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir.1995) (noting that officers could be liable for excessive force where they pointed guns at and handcuffed several non-threatening individuals); Baldwin v. Placer County, 418 F.3d 966, 970 (9th Cir.2005) (finding excessive force where officer pointed gun at rear of plaintiffs' heads with no evidence that plaintiffs might be violent). We need not decide that issue here.
 
 
 [9]
 Because we find that exigent circumstances justified the search, we do not consider whether Tiffany Couden provided valid consent for a search
 
 
 [10]
 In their brief to this Court, plaintiffs refer to common law claims against Agent Duffy. Plaintiffs' complaint does not assert any such claims, however. Regardless, any common law claims against Agent Duffy would be barred because an action against the United States under the FTCA provides the exclusive remedy for nonconstitutional torts based on the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1);see also Castro v. United States, 34 F.3d 106, 110 (2d Cir.1994) (finding that "a claimant's exclusive remedy for nonconstitutional torts by a government employee acting within the scope of his employment is a suit against the government under the FTCA").
 
 
 [11]
 "Governmental entity" for purposes of the statute includes municipalities, towns, and counties. Del.Code Ann. tit. 10 § 4010(2)
 
 
 [12]
 Plaintiffs also argue that the District Court erred in denying their request under Federal Rule of Civil Procedure 56(f) that defendants' summary judgment motions be denied to allow for further discovery. We review denial of a Rule 56(f) motion for abuse of discretionSee Radich v. Goode, 886 F.2d 1391, 1393 (3d Cir.1989). Under Rule 56(f), a court may order a continuance for further discovery if it appears "from the affidavits of a party opposing [summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." The District Court denied plaintiffs' request on the grounds that plaintiffs did not file an affidavit to support the motion, as required under Rule 56(f), and that they did not identify the information sought, how it would help their case, or why it had not already been obtained. Couden, 305 F.Supp.2d at 386. These grounds were reasonable, and we conclude that the District Court did not abuse its discretion in this regard.
 
 
 
 50
 WEIS, Senior Circuit Judge, Dissenting.
 
 
 51
 The role of the police is not a simple one. Officers are charged with the duty of protecting the community from criminal elements and with responding to calls for help by the citizenry in widely varying circumstances, all the while carrying out confrontational occurrences with due regard for the constitutional rights of the citizenry. Because the line between what proper enforcement requires and what will constitute a violation of established rights is often indistinct, the law recognizes qualified immunity for police officers and other officials to encourage effective enforcement by easing the likelihood of personal liability in carrying out official duties.
 
 
 52
 Qualified immunity is an important legal concept designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). If officers are not on notice that their conduct in particular situations is clearly unlawful, summary judgment based on qualified immunity is appropriate. This immunity is broad in scope and protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
 
 
 53
 A narrow, cramped approach to qualified immunity does not serve the community nor is it in accord with Supreme Court jurisprudence. As the Court of Appeals for the Fourth Circuit has recognized,
 
 
 54
 "If every mistaken seizure were to subject police officers to personal liability under § 1983, those same officers would come to realize that the safe and cautious course was always to take no action. The purposes of immunity are not served by a police force intent on escaping liability to the cumulative detriment of those duties which communities depend upon such officers to perform."
 
 
 55
 Gooden v. Howard County, 954 F.2d 960, 967 (4th Cir.1992) (en banc).
 
 
 56
 The Supreme Court has prescribed a two-step process in evaluating a claim for qualified immunity. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. First, plaintiffs must establish that defendants violated a constitutional or statutory right. Id. If the court determines that defendants violated a constitutional or statutory right, the next step is to determine whether the right in question was clearly established. Id. Often this second inquiry is founded on whether a novel issue or a well-established interpretation of the law is in controversy. If there is doubt about the state of the law, the officer is granted immunity.
 
 
 57
 There is another class of qualified immunity cases, however, where the issue is not whether there was a misunderstanding about the law, but rather whether the officer made a reasonable mistake of fact in carrying out his duties. See Butz v. Economou, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (holding that officers "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law").
 
 
 58
 The difference between a mistake of fact and a mistake of law is illustrated by the not unusual situation involving an unlawful search of a home. In some instances, there may be a legal question as to the scope of the search authorized by the warrant. But in other instances there may be a mistake of fact, such as an error with respect to the particular house to be searched. Qualified immunity may be applicable in both cases. See e.g., Maryland v. Garrison, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (wrong apartment searched); Dean v. City of Worcester, 924 F.2d 364 (1st Cir.1991) (wrong person arrested because of mistaken identity).
 
 
 59
 The case before us includes mistakes of fact on the part of everyone involved. The police believed that they were confronted by criminals in the commission of burglary or by a fugitive at large. The plaintiffs were under the erroneous impression that they were threatened by armed robbers.
 
 
 60
 At first blush, as plaintiffs would have us believe, it would be unlikely that police officers would reasonably think that a 14-year-old boy carrying a skate board to his home was a burglar. But, there are critical and undisputed facts that the plaintiffs fail to discuss that the District Court took into consideration. Although we consider the evidence in the light favorable to the plaintiffs, we must review all of the undisputed facts, not just those that the plaintiff chooses to emphasize.
 
 
 61
 The Supreme Court has explained,
 
 
 62
 ". . . the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. . . . [T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is genuine issue for trial. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. . . . In essence though, the inquiry is . . . `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"
 
 
 63
 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 249-50, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original) (internal citations omitted).
 
 
 64
 This is a somewhat different standard than that used in Federal Rule of Civil Procedure 12(b)(6) motions where even the sometimes fanciful allegations in a plaintiff's complaint are accepted as true.
 
 
 65
 The proper, comprehensive view of all of the evidence here develops the following picture. The plaintiffs' home was on the corner of Sanford Drive and Argyle Road. Pamela Couden stopped her car on Argyle Road and her son Adam got out. He crossed Argyle toward the rear of his home. From there, he was able to gain entrance to the rear of the garage which apparently was on the far side of the house rather than alongside Argyle Avenue.[13] The plaintiffs admit it was dark at the time, a critical factor in evaluating what happened.
 
 
 66
 Pamela waited in the car for some unspecified time until she decided that Adam was taking too much time. She then drove the car around the corner to her left on to Sanford Drive and pulled into her driveway in front of the garage. She could not see Adam so she put on the high beams of her headlights and blew the horn. Still getting no response, she blew the horn again.
 
 
 67
 At that point, she noticed officer Armstrong (in plain clothes) walking slowly on Argyle Street toward her. According to Pamela, he approached the car with a gun, pointed it toward her head and tried to open the door. She alleges that Armstrong did not identify himself although that is contradicted by Officer Freebery. Pamela panicked and drove her car to the left toward Officer Freebery, who had been following behind Armstrong. Faced with a car coming toward him with the headlights on high beams, Freebery threw his flashlight at the auto and broke the passenger side window.
 
 
 68
 Adam who had entered the garage by this time, heard the car wheels screeching, the noise of the broken glass and his mother screaming, "He's got a gun!" As Adam started to leave the garage, he saw a man with a gun charging toward him. Adam slammed the door shut and held it tight for a while. He then ran to a door that led into the house where he was seized by a group of men, wrestled to the floor, sprayed with pepper spray or mace and handcuffed.
 
 
 69
 Plaintiffs have conceded that "[d]efendants Armstrong and Freeberry [sic] believed Adam[']s mom was conspiring with the fugitive (Adam), for the purpose of helping him get away. For this reason and because of the totality of the circumstances which led the [d]efendants to believe the fugitive was dangerous or violent, they thought that they needed to get out of their car, and go onto the Couden's property to investigate."[14]
 
 
 70
 Even reviewing the disputed facts in favor of the plaintiffs, it is clear that this case was one of mistaken identity and an erroneous appraisal of the circumstances by the police officers. That reasonable mistake of fact neither establishes a constitutional violation nor does it deprive the officers of qualified immunity. The majority opinion concedes that the officers did not act maliciously or wilfully, though they may have been overzealous.
 
 
 Pamela Couden
 
 
 71
 Although the majority concludes that Officer Armstrong violated Pamela Couden's Fourth Amendment rights by seizing her, it is undisputed that Pamela fled from the police officers. She was not detained in any sense and she has not established a Fourth Amendment violation.
 
 
 72
 California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), discussed whether "with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not . . . neither usage nor common-law tradition makes an attempted seizure a seizure." Id. at 626, 626 n. 2, 111 S.Ct. 1547 (emphasis in original).
 
 
 73
 In that case, the Court held that a "seizure" in the constitutional sense did not occur until a pursuing police officer tackled a fleeing suspect. The Court concluded that even if the officer's pursuit and calling for the suspect to halt acted as a show of authority, a seizure did not occur until the physical contact occurred.
 
 
 74
 County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), reaffirmed Hodari. In Lewis, the Court held that no Fourth Amendment seizure occurred when a pursuing police car sought to stop a suspect by using flashing lights, but accidentally stopped him by crashing into him.
 
 
 75
 No seizure occurs until a suspect has submitted to the show of authority that makes her feel she is not free to leave or where the officer applies physical force to her. "If [an individual] manifests his belief that he has not been seized by attempting to flee, he has not submitted to a show of authority and, therefore, has not been seized." U.S. v. Smith, 423 F.3d 25, 31 (1st Cir.2005) (citing Hodari D., 499 U.S. at 626-29, 111 S.Ct. 1547).
 
 
 76
 At best, the officers here may have attempted to seize Pamela, but as the Supreme Court has recognized, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." Lewis, 523 U.S. at 845 n. 7, 118 S.Ct. 1708.
 
 
 77
 Even if the officers' conduct could have been construed as a seizure, police have authority under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to accost an individual and restrain his freedom to walk away. A so-called "Terry stop" requires the officer to have a reasonable suspicion "that criminal activity is afoot." Here, there was information that a fugitive was in the area and the police were on alert. Pamela's conduct in first parking her car on Argyle Street to allow Adam to exit, then later moving over to Sanford Drive was enough to lead the officers to suspect something unusual was in progress, at least enough to justify inquiry.
 
 
 78
 The officers reasonably could have interpreted Pamela's flashing of her high beams and honking of her horn as a warning to the individual who had entered the garage. Considering all the circumstances, Officer Armstrong did not act unreasonably in approaching Pamela's car for questioning. Unfortunately, the inquiry which could have averted the situation was frustrated by Pamela's fleeing in a panic, a circumstance which reasonably supported the officer's suspicions that indeed something was amiss.
 
 
 79
 The test to determine whether the officers are entitled to qualified immunity is whether they acted reasonably under the circumstances that then existed. All the events leading up to the incident are relevant. Abraham v. Raso, 183 F.3d 279, 291 (3d Cir.1999).
 
 
 80
 The fact that Officer Armstrong displayed a pistol was not unreasonable in light of the information about a fugitive suspected of weapons violations being in the area. The display of a gun did not act to make the incident a seizure nor was it otherwise unconstitutional.
 
 
 81
 In Mellott v. Heemer, 161 F.3d 117 (3d Cir.1998), five deputy United States Marshals entered the home of plaintiffs to effect an eviction. Allegedly, the marshals pointed loaded guns at plaintiffs. In addition, one of the plaintiffs asserted that she was pushed into a chair on two occasions and a second plaintiff claimed that he was led at gunpoint into a potentially dangerous situation. Weighing the factors outlined in Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), we held that the conduct did not violate the Fourth Amendment. Although the crime was not severe and the plaintiffs were not actively resisting, there was reason to believe that they posed a threat to the officers because there was evidence that firearms were in the house. Id. at 122-23.
 
 
 82
 In Sharrar v. Felsing, 128 F.3d 810 (3d Cir.1997), we held that it was not a constitutional violation to use twenty officers, including a SWAT team armed with machine guns and an FBI hostage negotiator to carry out a domestic violence arrest. 128 F.3d at 821. We noted that the methods used by the police in that case "appear[ ] extreme," but that "[i]t does not follow . . . that the extreme methods used in effecting the arrests, such as requiring plaintiffs to lie face down in the dirt, with guns to their heads and vulgar threats, were constitutionally excessive." Id.
 
 
 83
 Officer Freebery did not act unreasonably in attempting to stop the car by throwing a flashlight at it. He was confronted by an automobile coming at him in a life-threatening fashion. In rapidly occurring events like this, officers must be given the benefit of the doubt as to the proper reaction to the situation. See Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir.2004) (noting that "`[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using [even] deadly force'" (quoting Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985))).
 
 
 84
 In Brosseau v. Haugen, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004), the Court concluded that in some circumstances it may be reasonable to use deadly force to stop an otherwise unarmed suspect fleeing in a car. The Court held that there was no clearly established violation of the Fourth Amendment where the officer reasonably believed the moving vehicle posed a threat of danger to police or others. Officer Freebery showed commendable restraint in tossing the flashlight rather than firing his pistol at the car. The threat of injury to the officers and possibly others, as well as the fact that the car was fleeing what then appeared to be a crime in progress certainly justified Officer Freebery's conduct.
 
 
 85
 There is no evidence that Officer Sullivan and Agent Duffy participated in any way with the confrontation with Pamela Couden and she has not established any constitutional violation as to them.
 
 
 Adam Couden
 
 
 86
 I agree with my colleagues that once Pamela sped away in her car the officers were reasonably concerned that a crime was underway and were justified in their decision to investigate the house further. When one of the officers approached, Adam slammed the back door of the garage and held it tight for a while, preventing the police from entering. Thus, the officers could reasonably believe that, in view of all the circumstances, Adam was resisting apprehension.
 
 
 87
 The police did not know that Adam was unarmed or that he was 14 years old. Plaintiffs have not disputed the officers' assertion that Adam was about six feet tall and weighed about 200 lbs. The officers' request after Adam was subdued to produce a driver's license confirmed that he appeared to be older than his years.
 
 
 88
 In short, there is no reason for the police to assume that they were not confronting an armed burglar or the fugitive they were seeking. Adam's allegation that four officers seized him and pushed him to the floor does not establish an unconstitutional use of excessive force. Nor does the assertion that in addition to being held on the floor, Adam was sprayed with mace or pepper spray establish an unconstitutional use of excessive force. See, e.g., Gallegos v. City of Los Angeles, 308 F.3d 987, 991 (9th Cir.2002) (use of drawn guns on a man believed to be a suspect was reasonable); Dean v. City of Worcester, 924 F.2d 364, 368 (1st Cir.1991) (reasonable for police to push man believed to be a suspect to the ground, push a knee in his back, place a gun to his head and threaten to "blow his head off," and then leave him handcuffed for thirty minutes while they determined his identity).
 
 
 89
 It is an important factor that Adam was not injured by the efforts used to subdue him. See Saucier, 533 U.S. 194, 209, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (noting that the "conclusion [that the officers did not use excessive force] is confirmed by the uncontested fact that the force used — dragging [the defendant] from the area and shoving him while placing him into a van — was not so excessive that [the defendant] suffered hurt or injury"); Mellott, 161 F.3d at 122 (noting that it is "important to consider . . . whether `the physical force applied was of such an extent as to lead to injury.'" (quoting Sharrar, 128 F.3d at 822)).
 
 
 90
 In reviewing excessive force claims, a court should consider the following factors among others:
 
 
 91
 "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."
 
 
 92
 Sharrar, 128 F.3d at 822. Further, the reasonableness of the use of force is evaluated in light of "`the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight'" Carswell, 381 F.3d at 240 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865).
 
 
 93
 In 20/20 hindsight one may conjecture that two officers might have been adequate to subdue Adam. However, they did not have the leisure nor the information to make such a choice. Indeed, in the circumstances it would appear that the use of superior force was a desirable measure to forestall attempts or inclinations by the perceived burglar to resort to a deadly weapon, especially when Tiffany Couden, an innocent bystander, was standing nearby.
 
 
 94
 The fugitive the officers sought was wanted on weapons charges among others. Plaintiffs have alleged that the police believed that Adam was the fugitive, and they could assume that he might be armed.
 
 
 95
 In Carswell, we concluded that a police officer was entitled to qualified immunity even though, through an error in judgment, he had shot and killed a fleeing individual. The case before us also involved a mistaken, but reasonable, belief by police officers; fortunately it did not result in injury to Adam.
 
 
 96
 The twenty minutes that he stayed in handcuffs is simply not enough time to vitiate qualified immunity. See Torres v. United States, 200 F.3d 179, 186 (3d Cir. 1999) (reasonable use of force to leave an unarmed suspect wearing only a towel handcuffed for one and a half to three hours); Dean, 924 F.2d at 368 (reasonable to leave man handcuffed for one-half hour while officers determined whether he was the fugitive they sought).
 
 
 97
 In hindsight, twenty minutes might have been longer than necessary here, but again, that misjudgment is not sufficient to expose the police to personal liability.
 
 
 98
 The cases the majority cites are distinguishable. In Baker v. Monroe Township, 50 F.3d 1186 (3d Cir.1995), the Court found that officers had used excessive force where they handcuffed several members of a family and continued to point guns at them where there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." Id. at 1193. In reaching this conclusion, the Court noted that "the appearances were those of a family paying a social visit." Id. Moreover, Baker was pre-Saucier and did not analyze the official immunity issue independently of the asserted constitutional violation.
 
 
 99
 In Robinson v. Solano County, 278 F.3d 1007 (9th Cir.2002) (en banc), another case cited by the majority, a man went to meet authorities when they arrived at his house in response to a call that he had shot his neighbor's two dogs with a shotgun. He calmly identified himself as the man involved with the dogs. One of the officers pointed a gun at his head from only three feet away. The Court found that this conduct violated the Fourth Amendment, but nevertheless granted official immunity. Id. at 1015-16.
 
 
 100
 Until he was identified, Adam Couden, on the other hand, could have posed a danger, and the police justifiably used the force they did to protect Tiffany as well as themselves from any potential harm.
 
 
 Sua Sponte Grant of Summary Judgment
 
 
 101
 I also believe that the District Court correctly granted summary judgment sua sponte with respect to Officer Sullivan and the City of Wilmington. District courts are entitled to grant summary judgment sua sponte in appropriate circumstances. See Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); see also Chambers Dev. Co. v. Passaic County Utils. Auth., 62 F.3d 582, 584 n. 5 (3d Cir.1995); Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903, 909-10 (3d Cir.1994).
 
 
 102
 In Gibson v. Mayor and Council of the City of Wilmington, 355 F.3d 215 (3d Cir. 2004), we affirmed a sua sponte grant of summary judgment despite lack of notice. Although we explained that sua sponte grants of summary judgment without notice are not preferable, we also noted that the requirement of notice could be waived in the presence of a fully developed record, lack of prejudice or a judgment based on a purely legal issue. Id. at 224. In Gibson we found a lack to prejudice to the complaining party.
 
 
 103
 Three of the four officers in the present case filed motions to dismiss the case or, in the alternative, for summary judgment. Plaintiffs were on notice to present all of their evidence. The grounds for granting summary judgment in favor of the moving defendants also applied to the claims against the non-moving defendant, Officer Sullivan.
 
 
 104
 It is significant that the plaintiffs have not shown how Sullivan's actions were such as to differentiate his liability from that of the other officers. Indeed, he did not participate in the encounter with Pamela Couden and only tangentially took part in subduing Adam.
 
 
 105
 In their briefs in this Court, the Coudens have failed to cite any facts that would demonstrate prejudice to their claims against officers Sullivan and the City of Wilmington. I would affirm the judgment in Officer Sullivan's favor as well, rather than remand to create unnecessary paper shuffling with an inevitable result.
 
 
 106
 The community not only has the right to have its police officers act with restraint, but also to respond responsibly to criminal activity without undue concern over potential lawsuits against them. The law should not, and does not, impose restrictions on proper use of force, the absence of which would endanger an officer's or bystander's life.
 
 
 107
 I believe that the officers in this case made a mistake in judgment that did not violate the plaintiffs' constitutional rights, but even if they violated the plaintiffs' rights, qualified immunity applies because of reasonable mistakes of fact.
 
 
 108
 I would affirm the judgment of the District Court as to all parties.
 
 
 
 Notes:
 
 
 [13]
 The parties failed to provide us with photos or sketches of the scene which would have been most helpful
 
 
 [14]
 Plaintiffs' Consolidated Response to the Defendants' Motion to Dismiss or for Summary Judgment in the District Court at 5